**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:                                                    :

                                                           :    **Chapter 11**

**SCORPION FITNESS INC., ET AL.**                         :

                                                           :    **Case No. 19-11231 (MEW)**

                                      Debtors.            :    **(Jointly Administered)**

-----------------------------------------------------------------x

### DECISION GRANTING MOTION TO CONVERT CASES TO CHAPTER 7, DENYING MOTIONS FOR RECONSIDERATION AND DENYING MOTION FOR ADDITIONAL ORDER COMPELLING RENT PAYMENTS

The chapter 11 trustee (the "Trustee"), with the support of the Debtors' chief creditors, has moved to convert these cases to cases under chapter 7 of the Bankruptcy Code. The motion is opposed by the Debtors' chief equity owner, John Shams, and also by Neal Magnus, who claims to be both an equity owner and a creditor of the Debtors. Mr. Shams has also asked me to reconsider some prior decisions and orders, to adjourn the Trustee's motion, and/or to postpone a decision until after disputes with creditors have been fully litigated. The Debtors' landlord has also asked me to compel the payment of unpaid post-petition rents.

Before ruling on the parties' motions and requests it is appropriate to review the history of this case and some of the prior rulings that I have made.

### Background

Debtor Scorpion Fitness, Inc. was formed for the purpose of developing and operating a high-end fitness center in midtown Manhattan. Debtor Scorpion Club Ventures LLC is an investment vehicle for investors in Scorpion Fitness. John Shams is the president and is the majority owner of the Debtors. Neal Magnus is also an equity owner. In some documents Mr. Magnus has described himself as a "partner" in Scorpion Club Ventures. He has also stated that he made loans to the Debtors, though the details are not clear.

Scorpion Fitness leased space for the proposed fitness center at 220 Fifth Avenue, New York.  The original lessor was Dino & Sons Realty Corp. LLC.  An entity named 220 Fifth Realty LLC ("220 Fifth Realty") contends that it is the successor to Dino & Sons.

The construction of the fitness center was to be financed, in part, by loans from the New York Business Development Corporation and by NYBDC Local Development Corporation d/b/a The Excelsior Growth Fund (collectively, "NYBDC").  Those lenders provided a total of $800,000 of funding.  I will discuss the terms of the loan documents and the security agreements below.  For now, it suffices to say that Scorpion Ventures was the borrower, Scorpion Fitness guaranteed the repayment of the loans, and NYBDC holds liens and security interests in substantially all of the assets of Scorpion Ventures and Scorpion Fitness to secure the Debtors' obligations.  NYBDC filed secured claims in these cases in the total amount of $822,871.04.

The Debtors also leased certain high-end fitness equipment from an entity named De Lage Landen Financial Services, Inc. ("De Lage Landen").  The leases had five-year terms and required monthly payments.

Prior to the filing of these bankruptcy cases the Debtors were involved in a series of bitter disputes with 220 Fifth Realty regarding construction delays, rent payments, mechanic's liens, water damage and other conditions at the premises.  These disputes led to three separate actions in the New York State court.  In one of those actions, on February 4, 2019, the New York State court issued a temporary injunction against a termination of the lease (a so-called "Yellowstone" injunction in state court parlance.)  However, the state court's order required the Debtors to deposit prior unpaid rents in escrow and to make timely rent payments to the landlord beginning March 1, 2019 and continuing while the action was pending.  *See* Exhibit K to the Landlord's Cross-Motion for Stay Relief and/or Payment of Post-Petition Rent, *etc.*  (ECF No. 21-12.)

2

Apparently, the Debtors did not comply with the state court's order, and the Yellowstone injunction was vacated by the state court in an order dated April 22, 2019. (ECF No. 21-13.) These bankruptcy cases were filed that same day. Construction was not finished and the fitness center was not open for business at the time the bankruptcy cases were filed.

### Motions Regarding Post-Petition Rent Payments

The Bankruptcy Code imposes deadlines for the assumption or rejection of nonresidential real property leases. *See* 11 U.S.C. § 365(d)(4). The deadline is normally 120 days, but that period can be extended by the Court for another 90 days. After that, the deadline may not be extended without the landlord's consent. *Id.* Section 365(d)(3) of the Bankruptcy Code also requires debtors to continue to pay rent that comes due on real property leases prior to the time the leases are assumed or rejected. *See* 11 U.S.C. § 365(d)(3).

On July 16, 2019 I held a hearing on the Debtors' motion for permission to deposit rent payments into escrow, and on the cross-motion by 220 Fifth Realty for relief from the automatic stay or for an order directing that timely post-petition rent payments be made. In preparation for that hearing I reviewed various papers that the parties had submitted, which included copies of the lease and its amendments and copies of certain papers that had been filed in the New York State court actions. The papers showed (as noted above) that the New York State court had denied the Debtors' request to defer or to limit rent payments while the state court litigation proceeded, and had directed that rent payments be continued.

In their motion before me the Debtors argued primarily that they believed they did not owe rent by virtue of Article 23 of the lease, which stated that the Debtors would not be obligated to pay rent until the landlord delivered possession of the premises. However, the Debtors entered into a subsequent Lease Modification Agreement dated June 30, 2017, a copy of

3

which was attached to the Declaration of John Shams. (ECF No. 16-4.) In the Lease

Modification Agreement, the Debtors plainly acknowledged that the obligation to pay rent had

already attached and that Scorpion Fitness was in default for the non-payment of both base rent

and additional rent that had previously come due. *Id.* ¶¶ 5(a), 5(b). The parties also agreed in

the Lease Modification Agreement that Scorpion Fitness would pay base rent and additional rent

going forward, and that the prior rent defaults would be cured by the payment of an additional

monthly sum. *Id.* ¶¶ 5(b), 5(c).

At the hearing on July 16, 2019, I pointed out to the Debtors' counsel that the Debtors'

argument under Article 23 of the lease essentially was an argument that the rent obligation had

never attached, and that this contention was belied by the terms of the Lease Modification

Agreement. *Id.* at 7:8-18. Counsel agreed, but contended that only "additional rent," and not

"base rent," was due. *Id.* at 7:18-8:13. However, the Lease Modification Agreement by its terms

plainly acknowledged the Debtors' obligation to pay both "base rent" and "additional rent."

The Debtors also argued in their motion papers that 220 Fifth Realty had not completed

certain work that it was obligated to complete and that the Debtors were not obligated to pay rent

until that work was done. At the July 16, 2019 hearing, however, I noted that while the Lease

Modification Agreement listed certain additional work that the landlord was obligated to

complete, it also stated that the landlord did not have to do that work if Scorpion Fitness was in

default in the payment of rent. *Id.* ¶ 6. Although the Debtors were arguing that their payments

of rent were conditioned upon the landlord's performance of other work, the parties' agreement

actually said the reverse. The agreement made clear that the Debtors were obligated to pay rent,

and that the landlord was not obligated to do anything if rent was not being paid.

4

The Debtors also argued in their papers that they were entitled to an abatement of rent pursuant to Article 9 of the lease, which stated that if all or part of the premises were rendered wholly unusable by fire or other casualty, then further rents would cease or be reduced until the date when the premises were repaired and restored. *See* Debtors' Motion to Deposit Post-Petition Rent in Escrow Pending Resolution of Lease Disputes, at 5-6 (ECF No. 16); Lease, art. 9 (ECF No. 16-2). The Debtors argued that this provision had been triggered by water damage to the property. The landlord argued in response that a burst pipe had not rendered the property wholly unusable and did not entitle the Debtors to a rent abatement or reduction. *See* Declaration of Pawan Melgiri, ¶¶ 34-35 (ECF No. 21-1.) The landlord also argued at the July 16, 2019 hearing that the provisions of Article 9 were applicable only in the event of a complete destruction of all or a portion of the premises, which had never happened. *See* Hr'g Tr. 18:17-20:9, July 16, 2019 (ECF No. 40).

I ruled at the conclusion of the July 16, 2019 hearing that there is no Bankruptcy Code provision that permits an escrow of rent, so that any request for permission to escrow rent had to rely on state law. In that regard the request for permission to escrow rent was akin to a request for preliminary relief pending a final hearing on the merits. However, I noted that the New York State court had already ruled against the Debtors on their state law application, and as a matter of state law had required the Debtors to pay rent going forward. I also held that to the extent that I was being asked to grant preliminary relief the record did not permit me to make the necessary findings of irreparable harm and likelihood of success on the merits, not only because the state court had already denied the requested relief but also because "it seems to me, from my reading of the lease documents, that there is a good chance that the rent obligation is not abated, based on where things currently stand." *Id.* at 28:16-21. I therefore ruled that the Debtors would need to

pay post-petition rent directly to the landlord in accordance with the lease, and not in escrow. *Id.*
at 29:25-30:2; *see also* Order dated August 12, 2019 (ECF No. 45.)

In a separate Order also dated August 12, 2019, I directed the Debtors to pay $75,547.36
to cure prior post-petition rent arrears. I also directed the Debtors to make monthly base rent
payments of $17,706.44 plus such "additional rents" as were due. The parties were directed to
attempt to reach agreement as to the amounts of any such "additional rent." (ECF No. 44.)

I also denied the landlord's request for relief from the automatic stay, and I extended the
deadline for the assumption of the lease. I noted during the July 16, 2019 hearing, however, that
the Debtors faced time pressures in light of the Bankruptcy Code deadlines for the assumption or
rejection of the lease. *See* Hr'g Tr. 14:6-15:4, July 16, 2019 (ECF No. 40.) The Debtors'
counsel stated in response that the Debtors would file proceedings and would attempt to obtain a
resolution of the disputes with the landlord before the assumption or rejection deadline was
reached. *Id.* at 15:8-12. I entered an Order on July 29, 2019 that extended the deadline for the
assumption or rejection of the lease through November 18, 2019. (ECF No. 36.)
Notwithstanding my admonition at the July 16, 2019 hearing, however, the Debtors did not
actually commence any proceedings with respect to their disputes with the landlord until the
Debtors filed an objection to the landlord's proof of claim on November 15, 2019 (ECF No. 84),
which was only three days before the deadline for the assumption or rejection of the lease.

The Debtors also filed a motion for permission to assume the lease on November 18,
2019. (ECF No. 87.) Technically, the last-day filing of the motion meant that the lease was not
rejected automatically under section 365(d)(4) of the Bankruptcy Code. *See In re Simbaki, Ltd.,*
520 B.R. 241, 245 (Bankr. S.D.T.X. 2014) and cases cited therein ("[a] review of both pre- and
post-BAPCPA cases shows that an overwhelming majority of courts hold that a trustee need only

file a motion to assume before the deadline"); *see also In re Republic Airways Holdings Inc.,* 573 B.R. 84, 86 (Bankr. S.D.N.Y. 2017) ("[u]nder Section 365 of the Bankruptcy Code, [the debtor] had 120 days to file a motion to assume or reject leases of nonresidential property such as the Hangar Lease, a deadline that can be extended for at most 90 days.")  But instead of instituting proceedings that might have resolved the parties' disputes before the deadline arrived, the Debtors instead delayed without explanation.  In addition, although the Debtors filed their objection to the landlord's claim on November 15, 2019, to my knowledge there has been no discovery and there have been no significant further proceedings with respect to that objection.

### Other Creditor Disputes and Rulings

Other disputes with creditors arose during the course of the case.  On September 24, 2019, De Lage Landen moved for relief from the automatic stay so that it could repossess its equipment.  (ECF No. 66.)  De Lage Landen complained that $24,015.61 was due and owing as of the date of the bankruptcy filings, and that no post-petition lease payments had been made.  I issued an Order on October 22, 2019 (ECF No. 73) that directed the Debtors to comply with their obligations to make post-petition payments pursuant to section 365 of the Bankruptcy Code, and that scheduled further proceedings in the event the parties disagreed, as of October 31, 2019, as to whether those obligations had been fully discharged.  I also denied the motion for stay relief but granted permission for the motion to be renewed on three days' notice if the Debtors failed to make ongoing payments on a timely basis.

At about this same time the attorneys for NYBDC requested a conference.  (ECF No. 74.) NYBDC contended that it had recently learned that the Debtors had received an insurance proceeds check that named NYBDC as an additional payee and as to which NYBDC claimed a perfected security interest.  NYBDC asked that the insurance proceeds be held in escrow until

7

NYBDC could determine whether it made sense for it to consent to the use of the money by the Debtors. No issues were raised at that time as to the existence or perfection of NYBDC's security interests. I held a hearing on November 5, 2019 and I heard arguments by the parties' counsel as to what should be done with the proceeds and whether they should be turned over to NYBDC. *See* Hr'g Tr. 3:6, 3:20, Nov. 5, 2019 (ECF No. 101.) On November 20, 2019 I entered an order directing that the insurance check be deposited in escrow and that the proceeds not be used except upon further order of the court. (ECF No. 90.)

### The December 2019 and January 2020 Motions for Further Relief and the Appointment of the Chapter 11 Trustee

Various parties in interest filed a series of additional or renewed requests for relief in December 2019 and January 2020.

On December 5, 2019, the landlord filed papers in opposition to the Debtors' motion to assume the lease. (ECF No. 95.) The landlord argued that the Debtors were unable to demonstrate an ability to cure defaults on a timely basis and were unable to provide adequate assurance of future performance under the lease, each of which is a prerequisite to the assumption of a lease. *See* 11 U.S.C. § 365.

On December 16, 2019, the Office of the United States Trustee filed a motion to convert the cases to chapter 7. (ECF No. 98.) The motion alleged that Mr. Shams had improperly used funds belonging to the Debtors to pay his personal expenses, and that the Debtors had not paid certain quarterly fees that were owed to the United States Trustee.

On December 20, 2019, De Lage Landen filed a second motion for relief from the automatic stay. (ECF No. 102.) De Lage Landen alleged that the Debtors had failed to make required lease payments in the period spanning November 15, 2019 and December 15, 2019.

8

On December 31, 2019, NYBDC filed papers in support of the motion by the United

States Trustee for a conversion of the cases to chapter 7.  (ECF No. 106.)  On that same day

NYBDC also asked for relief from the automatic stay to enforce its security interests in the

escrowed funds.  (ECF No. 110.)

On January 3, 2020, the landlord joined in the motion by the United States Trustee for a

conversion of the cases to chapter 7.  (ECF No. 114.)

On January 8, 2020, the Debtors filed a motion seeking permission to use the insurance

proceeds.  (ECF No. 118.)  As noted above, the Debtors had not previously challenged the

existence and perfection of NYBDC's interests in the relevant insurance proceeds.  In their

motion papers, however, the Debtors challenged whether NYBDC actually held such security

interests.  NYBDC filed opposition papers on January 13, 2020 (ECF No. 125), which included a

copy of the relevant Security Agreement.

The Debtors' primary argument about NYBDC's security interests was that a security

interest in "fixtures" does not extend to ordinary building materials.  *See* N.Y.U.C.C. § 9-334(a).

However, NYBDC's security interests plainly are not limited to "fixtures."  The Security

Agreement makes clear that NYBDC's security interests cover all of the Debtors' "personal

property and fixtures."  *See* NYBDC Opposition, Exhibit A. (ECF No. 125.)  Ordinary building

materials may not have constituted "fixtures," but they did constitute personal property.

The Debtors also contended that NYBDC had not perfected its security interests in

insurance proceeds.  The Debtors' primary argument was that NYBCD was not a named "loss

payee" under the relevant policy.  Conflicting evidence was offered to the Court on this

particular point.  NYBDC noted that the Security Agreement required the Debtors to name

NYBDC as an additional "loss payee" on insurance policies, and NYBDC provided copies of a

9

Certificate of Insurance that purported to accomplish that result.  *See* NYBDC Opposition,

Exhibit E. (ECF No. 125.)  The check issued by the insurer also named both the Debtors and

NYBDC as payees.  However, the Debtors alleged that they had removed NYBDC as a loss

payee by way of a March 2019 endorsement.

The disputes over the "loss payee" designation ultimately do not matter, however,

because the Security Agreements and the UCC Financing Statements were sufficient to perfect

NYBDC's security interest in the insurance proceeds.  The Security Agreement covered

NYBDC's security interests in all personal property and fixtures as well as "all proceeds and

products of the foregoing including insurance proceeds from the sale, destruction, loss or other

disposition of any of the foregoing . . ."  *Id.*  The security interest in proceeds (including

insurance proceeds) was perfected by the filing of the UCC Financing Statement, which covered

"all goods, assets and personalty" of the Debtors as well as "all proceeds (including insurance

proceeds) from the sale, destruction, loss or other disposition of any of the Collateral . . ."  *Id.,*

Exhibit B.  A separate Note and Security Agreement in favor of the NYBDC Excelsior Growth

Fund similarly granted security interests in all "business assets" of any kind, including

"insurance proceeds."  *Id.*, Exhibit C.  A separate UCC Financing Statement was filed to perfect

the security interests granted by that separate security agreement.  *Id.*, Exhibit D.

The security agreements and UCC-1 filings were sufficient to perfect NYBDC's security

interests in insurance proceeds, regardless of whether NYBDC was named as a "loss payee" in

the underlying policies.  *See In re Holtslander*, 507 B.R. 779, 783 (Bankr. N.D.N.Y. 2014) ("[a]

perfected security interest in the collateral will give the secured party a perfected security interest

in the proceeds upon damage to or destruction of the collateral.  Under Article 9, the secured

party therefore does not have to be a named [insurance policy loss] payee in order to have its

10

security interest in the [insurance] proceeds recognized."); *PES Holdings, LLC v. Official Comm. of Unsecured Creditors of PES, Inc. (In re PES Holdings, LLC)*, No 19-11626 (KG), 2020 WL 1047768, at *20 (Bankr. D.Del. Feb 28, 2020) ("New York case law makes it clear that by having a security interest in collateral the [the creditor] obtained a perfected security interest in insurance proceeds resulting from the loss to collateral."); *In re Anderson*, 599 B.R. 504, 517 (D.Md. 2019) (creditor's perfected security interest covering debtor's real property and insurance proceeds from real property preserved creditor's security interest in proceeds paid from insurance policy after casualty event.)

### **The January 2020 Hearings**

I held a hearing on January 15, 2020 to consider the Debtors' emergency request for permission to use cash collateral. *See* Order dated January 8, 2020. (ECF No. 120.) It appears that no party has ever prepared or filed a transcript of that hearing. However, at that hearing the Court noted that it was unable, based on the materials that had been submitted, to find that NYBDC lacked a security interest in the insurance proceeds. As to the Debtors' alternative argument that NYBDC would be adequately protected if its collateral were used – based on the alleged benefits of completing the project – the Court noted that there were pending motions to convert the case to chapter 7 and so it could not find that a completion of the project was likely, let alone that it would provide adequate protection for NYBDC's interests.

I then held a two-day trial on January 21 and 22, 2020 to consider the other pending motions. The evidence at trial disclosed that the Debtors' funds clearly had been used to pay many personal expenses of Mr. Shams, and that the Debtors had not maintained the types of controls over cash expenditures that the Bankruptcy Code requires. During the course of the hearing, however, I noted that if the buildout of the space could be completed it might provide a

11

better outcome for all of the parties than a chapter 7 conversion would provide.  I pointed out that pursuant to section 1112(b)(1) of the Bankruptcy Code I had the power to appoint a chapter 11 trustee in lieu of dismissing the cases or converting them to chapter 7, so long as the appointment of a chapter 11 trustee under section 1104(a) of the Bankruptcy Code was in the best interests of creditors and the Debtors' estates.  I therefore asked the parties to consider if their interests might be better served by the appointment of a trustee who could make an independent assessment of the Debtors' prospects and of whether the construction and operation of the fitness center could be completed, and whether that could provide better recoveries.

The attorneys for 220 Fifth Realty subsequently made an oral motion in open court for the appointment of a chapter 11 trustee.  They renewed that motion, again in open court, at the close of the record.  Counsel to NYBDC joined in the oral motion, and counsel to De Lage Landen and the United States Trustee stated that they did not oppose it.

I held at the conclusion of the hearing that a chapter 11 trustee would be appointed.  The various creditors agreed to defer their pending motions for other relief until such time as the trustee could investigate the business and its potential prospects.  I entered an Order on January 30, 2020 that appointed Salvatore LaMonica, Esq. as the Trustee.  (ECF No. 163.)

### The Pending Motions

As I noted, I now have before me the Trustee's motion to convert these cases to chapter 7.  (ECF No. 197.)  I also have a renewed motion by the landlord for an order compelling the payment of post-petition rents.  (ECF No. 190.)  De Lage Landen and NYBDC have filed papers in support of the Trustee's motion.  (ECF Nos. 203, 206.)  I held telephone hearings to consider these matters on May 6, 2020 and May 14, 2020.

The Trustee argues that the Debtors have no reasonable prospects of rehabilitation and that the cases should be converted.  The Trustee states that there are no unencumbered funds in the estate available to make the required post-petition rent payments to the landlord and to De Lage Landen.  I have previously issued orders directing that such payments be timely made.  At this point, however, the payments in each case are six months in arrears.

The only possible available funds are the $321,000 of escrowed funds that are subject to NYBDC's security interest.  However, NYBDC opposes the use of its cash collateral.  In the absence of NYBDC's consent, its collateral may not be used unless "adequate protection" of its interest is provided.  *See* 11 U.S.C. § 363.  NYBDC already has liens on all of the Debtors' business assets, personal property, and fixtures.  The only supposed protection for the use of NYBDC's collateral that has been suggested is the prospect that the use of its cash collateral somehow will allow the Debtors to succeed and that the Debtors will then be able to repay the loans in full.  That prospect is not sufficient under section 361 of the Bankruptcy Code unless it is the "indubitable equivalent" of NYBDC's security interest in the escrowed cash.  *See* 11 U.S.C. § 361.  The Debtors' prospects are bleak, and the possibility that they might somehow succeed cannot reasonably be said to be the "indubitable equivalent" of NYBDC's present security interests in cash.

The Trustee has concluded, too, that even if the $321,000 of escrowed cash were made available it would not be sufficient to fund the completion of construction (which has an estimated minimum cost of at least $200,000), to pay the unpaid post-petition rent payments that are due (which apparently exceed $100,000 through May 2020), to pay the overdue amounts to De Lage Landen, to pay unpaid professional fees and other administrative expenses, to pay the real property and personal property lease obligations that are likely to accrue until the many

litigation proceedings and disputes can be resolved, and to pay whatever "cure" payments ultimately might be owed to the landlord and to De Lage Landen, let alone to pay start-up costs that would include marketing, payroll, insurance and inventory expenses.

In response, Mr. Shams and Mr. Magnus have opposed conversion. Mr. Shams has asked me to reconsider and to vacate the prior order that I issued requiring the payment of post-petition rent, and has criticized my decision to appoint the Trustee. Mr. Shams also blames the major creditors for the Debtors' plight. He has not disputed the Trustee's contentions about the cash that would be needed to finish construction and to open the business, but he contends that the Debtors have meritorious litigation claims against 220 Fifth Realty and NYBDC and that those claims (if pursued and litigated) would ultimately allow the Debtors to open for business. Mr. Shams has also filed requests for adjournment, contending that the current coronavirus pandemic has inhibited his ability to respond to the motions and also arguing that I should do nothing further until all of the Debtors' disputes with creditors have been resolved on the merits. He has also filed a new proceeding that challenges the liens and security interests asserted by NYBDC.

I have reviewed my prior decisions and the record on which those decisions were based, and I see no reason to reconsider or to reverse those prior decisions.

As to the commencement of the obligation to pay rent: the evidence that I have (including prior rulings by the state court as well as the clear terms of the parties' Lease Modification Agreement) suggests that it is very unlikely that the Debtors would succeed in their contention that "possession" was not delivered and that the rent obligation did not commence. To the contrary: the Debtors have previously agreed that the rent obligations did commence and that the Debtors were in default for failure to pay rents.

Mr. Shams contends that the Debtors' right to an abatement under Article 9 of the lease, based on water damage at the property, was never considered and ruled upon. But in fact the issue was raised in the papers submitted in support of the Debtors' motion for permission to deposit rent payments into escrow and was discussed at the July 16, 2019 hearing. Even if that were not the case, it hardly explains why Mr. Shams would have waited until many months later to raise the allegedly overlooked issue.

I note, too, that the Debtors themselves previously recognized that the landlord is entitled to the payment of post-petition rent under section 365(d)(3) of the Bankruptcy Code, and in order to protect that interest the only relief that the Debtors actually sought in July 2019 was to allow rent payments to be paid into escrow. The Debtors did not ask, at that time, that they be excused from the obligation to pay rent.

In any event, there was no evidence before me on July 16, 2019, and there is no evidence before me now, that suffices to show that the Debtors have a likelihood of succeeding in their contention that Article 9 entitles them to a rent abatement. Article 9 applies if some or all of the premises are rendered completely unusable. But the major "use" of the space, at the beginning of the lease period, is for the completion of construction. The Debtors admittedly have had access to the space to perform construction work since some time prior to December 2019, and the Debtors have previously represented that they were actively engaged in finishing the construction of the space. Hr'g Tr. 15:17-21, July 16, 2019 (ECF No. 40); Disclosure Statement Under Chapter 11 for Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code dated Nov. 20, 2019, at 3 ("[T]he Debtors have been remediating the premises and target their opening for no later than February 1, 2020 subject to delays beyond the Debtors reasonable control.") (ECF No. 91).

Mr. Shams complains that the landlord has misbehaved and is trying to destroy the

Debtors' business so that the landlord can lease the space to someone else at a higher rent.  But

despite my warnings, the Debtors never initiated proceedings that would permit these grievances

to be decided in a timely trial on the merits.  I cannot reasonably assume that the Debtors will

succeed in their disputes, and in fact the information that has been presented to me suggests that

the Debtors are not likely to succeed on the various "rent abatement" issues they have raised.

Mr. Shams also argues that the landlord, 220 Fifth Realty LLC, is not a real party in

interest because the landlord is really an entity named "220 5th Realty LLC."  However, the

Debtors used the name "220 Fifth Realty" in their own filed schedules listing their liabilities, and

"220 Fifth Realty" is the name the Debtors used when they filed suit in the state court.  The two

names really refer to the same entity.

I have previously made rulings about the rights of De Lage Landen and about NYBDC's

security interests in the insurance proceeds.  I see no reason to question or to revisit those prior

rulings.  I also do not see any merit in new arguments that Mr. Shams has raised about the liens

and security interests held by NYBDC.

As explained above, the underlying security agreements and UCC-1 filings make clear

that NYBDC holds security interests in all personal property and fixtures of the Debtors,

including any insurance proceeds.  The security agreements and UCC-1 filings were sufficient to

perfect NYBDC's security interests, making it unnecessary to determine whether NYBDC was

or was not named as a "loss payee" on the relevant insurance policy.

Mr. Shams has contended that the relevant Security Agreement mistakenly identified

both Scorpion Club Ventures LLC and Scorpion Fitness, Inc. as "borrowers."  NYBDC has

provided the Court with copies of the relevant loan and security agreements and UCC filings.

The documents show that Debtor Scorpion Club Ventures LLC borrowed funds from NYBDC and that Debtor Scorpion Fitness, Inc. guaranteed that obligation.  *See* Supplemental Response in Support of Lenders' Security Interest and exhibits attached thereto ("Supplemental Response") (ECF No. 216.)  It is true that the Security Agreement referred to both entities as "borrowers," but it also defined both entities as "debtors."  Even if Scorpion Fitness was not a "borrower" it was, in fact, a "debtor" under the plain terms of the loan documents and guarantees.  Scorpion Fitness guaranteed the repayment of the loan and agreed to pledge its own assets in support of that guarantee.  There was nothing invalid or improper about the fact that Scorpion Fitness, Inc. pledged its own assets in support of its guaranty obligations; that is something that is commonly done in financing transactions.

The description of Scorpion Fitness as a "borrower" did not create any ambiguity as to the parties' obligations and did not invalidate any of those obligations.  The Note that was executed at the same time identifies Scorpion Ventures as the "borrower," and the Guarantee that was executed at the same time identified Scorpion Fitness as a guarantor.  The opening of the Security Agreement clearly identifies Scorpion Ventures and Scorpion Fitness each, individually, as a "debtor."  Paragraph 1 of the agreement states plainly that the security interest created by the agreement "secures payment of any and all indebtedness of debtor to Secured Party, whether now existing or hereafter incurred . . ."  It was not limited to obligations of a "borrower" but plainly applied to the obligations of each "debtor."  The UCC Financing Statement correctly identified Scorpion Fitness as a "debtor" whose assets were subject to liens and security interests, and was sufficient to perfect those liens and security interests.

I therefore hold that the description of Scorpion Fitness as a "borrower" in the Security

Agreement did not create any ambiguity or defect of a kind that would invalidate the underlying

debts and the underlying security interests.

Mr. Shams has also complained that the filing of the UCC financing statement on

December 20, 2017 preceded the execution of the loan documents and security agreements on

January 29, 2018, and that the financing statement therefore allegedly was unauthorized and

ineffective.  However, the Uniform Commercial Code permits a filing to be made in advance of

the execution of a security agreement so long as the filing itself is authorized.  *See* N.Y.U.C.C.

§§ 9-502(d), 509.  The parties disagree as to whether a Commitment Letter that was executed by

Mr. Shams in October 2016 was still in effect and whether it provided such an authorization.

However, I have previously held in another case that the execution of a security agreement is

sufficient to ratify and thereby to authorize a previously-filed UCC financing statement.  *See*

*Official Comm. of Unsecured Creditors. of Adoni Grp., Inc. v. Capital Bus. Credit, LLC (In re*

*Adoni Grp., Inc.)*, 530 B.R. 592 (Bankr. S.D.N.Y. 2015).  On that basis, the execution of the

Security Agreement in January 2018 was sufficient to ratify and authorize the UCC statement

that had been filed in December 2017.[1]

Mr. Shams has complained that the Trustee has not explored other possible sources of

capital, but surely if Mr. Shams or the other investors knew of any they should have identified

those sources of capital themselves.  At the hearing held on May 6, 2020, the Trustee indicated

---

[1]    The papers submitted by NYBDC in January 2020 showed that a separate Note and Security
Agreement was executed in 2018 to cover $100,000 of funds advanced by the NYBDC
Excelsior Fund, and the corresponding UCC Financing Statement was filed *after* that Note
and Security Agreement were executed.  *See* NYBDC Opposition, Exhibits C and D. (ECF
No. 125.)  Mr. Shams's complaints about the timing of the first UCC-1 filing do not apply to
this agreement and this separate UCC-1 filing.

that Mr. Shams informed him that potential investors existed, but that none were willing to commit any funds until after the litigation with the landlord was resolved.

Mr. Shams has criticized the decision to appoint the Trustee, but the evidence at the January 2020 hearings required that something be done, as the Debtors' funds had been used improperly.

Mr. Shams has also complained about his ability to respond to the motions, based mostly on difficulties he has had in obtaining audio recordings of some of the prior hearings in this Court. But when we learned of Mr. Shams's difficulties in obtaining those recordings I directed my law clerk to send copies of the relevant transcripts directly to Mr. Shams. In any event, those prior hearings are relevant only to the extent that Mr. Shams wishes to ask me to reconsider my prior rulings. I have carefully reviewed the entire record and I see no reason to do so.

Mr. Shams has complained that he has had difficulty making court filings because he is not registered with the Court's ECF filing system. However, we have gone to great lengths to make sure that we have retrieved and reviewed all of the many filings that both Mr. Shams and Mr. Magnus have attempted to make and that they have continued to make, and we have considered all of the arguments they have made.

The Debtors have been represented by a series of attorneys during the state court litigations and in the course of these cases. Mr. Shams suggests that the Debtors' problems are attributable to terrible mistakes made by those attorneys and that the Debtors should not be held responsible for these mistakes. The accusations against prior counsel are not particularly credible. More importantly, parties generally are bound by the actions of their counsel, and the Debtors are responsible for the arguments made during prior hearings and the contentions that were asserted. *See Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1101 (9th Cir. 2006)

("[P]arties should be bound by and accountable for the deliberate actions of themselves and their

chosen counsel. This includes not only an innocent, albeit careless or negligent, attorney mistake,

but also intentional attorney misconduct."); *Cannon-Stokes v. Potter*, 453 F.3d 446, 449 (7th Cir.

2006) ("[A] debtor in bankruptcy is bound by her own representations, no matter why they were

made. . .   The remedy for bad legal advice lies in malpractice litigation against the offending

lawyer."); *U.S. Commodity Futures Trading Comm'n v. eFloorTrade, LLC*, No. 16 Civ. 7544

(PGG), 2020 WL 2216660, at *4 n.5 (S.D.N.Y. 2020) (rejecting argument that stipulation

entered into as a result of poor legal advice should be set aside); *Mason Tenders Dist. Council

Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 16 (S.D.N.Y. 2019) ("Litigants are

generally bound by the professional conduct of the attorneys they choose to represent them,

although the conduct of counsel may give rise to a claim for malpractice by the client.") (internal

citations omitted).  As the Supreme Court held in *Link v. Wabash R. Co.*, 82 S.Ct. 1386, 1390,

370 U.S. 626, 633–34 & n.10 (1962):

> Petitioner voluntarily chose this attorney as his representative in the action,
> and he cannot now avoid the consequences of the acts or omissions of this
> freely selected agent.  Any other notion would be wholly inconsistent with
> our system of representative litigation, in which each party is deemed bound
> by the acts of his lawyer-agent and is considered to have 'notice of all facts,
> notice of which can be charged upon the attorney.' . . . [I]f an attorney's
> conduct falls substantially below what is reasonable under the circumstances,
> the client's remedy is against the attorney in a suit for malpractice.  But
> keeping this suit alive merely because plaintiff should not be penalized for
> the omissions of his own attorney would be visiting the sins of plaintiff's
> lawyer upon the defendant.

I note that no complaints about counsel were made during prior hearings.  If Mr. Shams

believed that arguments were not being pursued that should have been pursued, he should had

done something about it before.  I will not entertain a belated request to undo prior rulings based

on these contentions.

Mr. Shams has asked for more time and has suggested that his disputes with his creditors

should be resolved before any other action is taken.  Mr. Magnus has asked that the motion be

denied so that more time can be spent pursuing mediation or other solutions.  But timely rent

payments are not being made to the landlord or to De Lage Landen, and that situation violates

the rights of those parties under section 365 of the Bankruptcy Code.  I cannot force existing

creditors to go without the compensation to which the Bankruptcy Code entitles them.  Nor can I

force NYBDC to allow its collateral to be used without its consent.  There exists no basis on

which I could reasonably find that the interests of those creditors are adequately protected.

Finally, Mr. Shams has argued that I should use the Court's power under section 105(a)

of the Bankruptcy Code to hold the creditors at bay and to make available an outcome that he

believes would be more equitable.  But my powers under section 105(a) only allow me to do

what is necessary to implement other provisions of the Bankruptcy Code.  *See generally Norwest*

*Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)

(confirming that as a general matter, "whatever equitable powers remain in the bankruptcy courts

must and can only be exercised within the confines of the Bankruptcy Code.")  Section 105(a)

does not permit me to disregard the statutory rights of secured parties and lessors.

I understand that Mr. Shams and Mr. Magnus believe that the Debtors might prevail in

litigation.  But nothing has been done that would have enabled a timely resolution of disputes the

Debtors may have with their creditors.  The Debtors waited until November of last year to object

to the landlord's claim, and that litigation has stalled.  The Debtors also waited until January of

this year before filing a complaint challenging NYBDC's lien, and that complaint does not even

include the contention that NYBDC lacked authorization to file UCC-1 statements.  The

Debtors' delays have forced everyone into a situation where only one of two things is possible:

21

either the landlord, De Lage Landen and NYBDC must be held at bay while litigation continues

(with potential significant financial risk to the landlord and to De Lage Landen if rents are not

being paid and potential significant financial risk to NYBDC if its cash collateral is used), or a

decision must instead be made based on best estimates and without a resolution of the underlying

issues following a trial on the merits.  I have not been presented with evidence that would enable

me to find that the Debtors are likely to succeed, or (more importantly) that the landlord, De

Lage Landen and NYBDC would be protected against the possibility that their positions would

worsen substantially while litigation claims were pursued.

I understand, too, that a conversion of these cases to liquidation proceedings may have a

devastating financial impact on Mr. Shams personally.  I have no doubt of the sincerity of his

belief that the fitness center could be a success.  I also have sympathy for other equity investors.

However, in the law generally, and in bankruptcy in particular, the interests of creditors have

priority over the interests of equity owners.  Equity owners do not have the right to gamble with

other people's money, or to demand that creditors put themselves further into the hole just to try

to salvage other parties' equity investments.

The Trustee has reasonably concluded that the hole that these Debtors find themselves in

is too deep.  The equity owners want the cases to be kept alive, but they have not offered

additional funds of their own to enable that to happen, either because they lack such additional

resources or because they are unwilling to commit additional resources.  The cases have been

kept open this long largely because I cajoled the primary creditors into finding out whether a

chapter 11 trustee could find a way to salvage a better recovery for them.  The Trustee and the

creditors have unanimously concluded that this cannot be done, and the facts before me make out

an overwhelming case that they are right.  I will therefore grant the motion to convert the cases

to chapter 7.

The landlord has also moved for the issuance of an Order compelling the payment of

post-petition rents or (in the absence of such payments) converting the cases to chapter 7.  There

is no reason for the issuance of an additional Order regarding the Debtors' obligation to pay post-

petition rent, which is clearly set forth in the Bankruptcy Code and which has already been

confirmed in prior Orders that I have issued.  As to conversion: I have already decided that such

relief is proper based on the Trustee's motion.

NYBDC, De Lage Landen and NYBDC have not formally renewed their motions seeking

relief from the automatic stay.  I will consider such requests if and when they do so.

Accordingly, I will grant the motion to convert the cases to chapter 7.  I will deny the

motion for an order compelling payments to 220 Fifth Realty on the ground that such an order is

unnecessary.

Dated: New York, New York
       May 18, 2020

                                              s/Michael E. Wiles
                                              Honorable Michael E. Wiles
                                              United States Bankruptcy Judge